FRED BURGER, Respondent, v. THE ST. LOUIS, KEOKUK & NORTHWESTERN RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, December 27, 1892.

1. **Railroads:** ATTRACTIVE DANGERS ON RIGHT OF WAY. It is negligence for a railway company to permit salt to remain exposed on its tracks, or on its right of way near them, so as to attract cattle, after it has become chargeable with notice that salt is thus exposed; and this, though it did not place the salt there, it being held guilty of negligence in such cases on the theory that its duty is to so police its right of way, as to prevent and remove all attractive dangers placed on its tracks or right of way by its servants or others.

2. ———: ———. And, where salt has thus been left exposed under a warehouse on the right of way of a railway company and near its tracks, it was *held*, that the railway company could not avoid liability in consequence thereof by mere proof that the warehouse belonged to a third party.

3. ———: ———: EFFECT OF KNOWLEDGE OF DANGER BY OWNER OF STOCK. An owner of stock may allow it to run at large notwithstanding that he knows that salt has been left thus exposed, and such knowledge will, therefore, not affect his right to recover for the loss of the stock in consequence of the negligence of the railway company.

4. ———: ———: SUFFICIENCY OF EVIDENCE OF RESULTING DAMAGES. To authorize a recovery for the loss of cattle alleged to have resulted from such negligence, it is incumbent upon the plaintiff to show by substantial evidence that the negligence was the cause of the injury sued for, though such evidence may be circumstantial. And *held*, ROMBAUER, P. J., *dissenting*, that the evidence thereof in this cause was sufficient.

5. ———: KILLING OF STOCK: DAMAGES. The damages of the owner of stock for the negligent killing thereof cannot be reduced by proof of the value of parts of the carcass, it not being the duty of the owner to make use of the carcass.

6. **Practice, Appellate:** RECITAL IN TRANSCRIPT OF OFFICIAL CHARACTER OF A JUSTICE OF THE PEACE. The official character of a justice of the peace, before whom an action for the killing of stock has been instituted, is established *prima facie* by a recital thereof in the transcript on appeal.

*Per Rombauer, P. J., dissenting:—*

7. **Railroads:** ATTRACTIVE DANGERS ON RIGHT OF WAY. While a railway company is under an obligation to police its track, so as not to make it extra hazardous to cattle at large, it is not under a similar duty with respect to its right of way outside of its tracks.

*Appeal from the Lincoln Circuit Court.*—HON. E. M. HUGHES, Judge.

REVERSED AND REMANDED *(nisi, and certified to Supreme Court).*

*Palmer Trimble* and *Dunn & Murphy*, for appellant.

*Joseph W. Powell*, for respondent.

BIGGS, J.—The plaintiff recovered a judgment against the defendant for $145, the value of five head of cattle, alleged to have been killed through the

negligence of the defendant. Two of the animals were killed during the night of May 23, and three in the night of May 25, 1891. The negligence, which caused the accident, is stated as follows: "The said defendant by its agents and servants did negligently and carelessly allow salt to be left uninclosed under and about its depot and warehouse building at the station of Hurricane, in the township of Burr Oak, and, by reason of such negligence and carelessness, the said cattle were attracted upon said railroad track of the said defendant and were killed as aforesaid." At the close of the plaintiff's case the court overruled a demurrer to the evidence, which the defendant now assigns for error; and it also complains of the action of the court as to the instructions given and refused, and that the verdict is excessive.

That it is actionable negligence for a railroad company to leave salt or hay on its tracks or near them, whereby cattle are attracted, and killed or injured, has been decided by the supreme court, (*Crafton v. Railroad*, 55 Mo. 580; *Schooling v. Railroad* 75 Mo. 518), and also by the Kansas City Court of Appeals (*Brown v. Railroad*, 27 Mo. App. 394; *Morrow v. Railroad*, 29 Mo. App. 432). This proposition is not denied. But the defendant claims that its demurrer to the evidence ought to have been sustained, because the plaintiff's evidence had no tendency to show that the negligence complained of was that of the defendant, nor that such negligence was the direct cause of the injury complained of. The disposition of this assignment requires a particular reference to the evidence, as we consider the question a very close one.

That the animals belonged to the plaintiff, that they were killed by the trains of defendant at or near Hurricane station, and that they were of the aggregate value of $145, are not matters of dispute. It is also

conceded, or at least there is no conflict in the evidence, that the defendant's station agent at Hurricane, who was also engaged in a general mercantile business on his own account, stored barrels of salt under a warehouse belonging to the Imperial Milling Company, which warehouse was situated on the defendant's right of way at the station on the west side of and near to the railroad track; that the warehouse was constructed several feet off the ground, and rested on pillars or posts; that some time previous to the accident, in conducting his business as a merchant, he (the agent) had deposited barrels of salt under the warehouse where cattle could get to them, and that one of the barrels was left open. Concerning the killing of the cattle the plaintiff testified that two of them, a heifer and a two-year-old steer, were killed on the night of May 23, and that they were struck at a point between the warehouse and the depot, which were thirty or forty yards apart and situated on the west side of the track; that the other animals were killed on the night of May 25; that one was struck about fifteen or twenty feet south of the wareroom; that another was found dead on the side of the track about three hundred feet south of the warehouse. Plaintiff also testified that he saw cattle tracks under the warehouse, and that the cattle had been licking the salt barrels, but he did not say whether he saw the tracks before or after the first two animals were killed. On his cross-examination, in answer to questions by defendant's counsel, he testified that Morris, who lived at the station and who was a witness for the defendant, told him before and after the first cattle were killed that his cattle were liable to be killed on account of the salt, and that he ought to keep his cattle away from the station.

Morris, the defendant's witness, testified that he told the plaintiff after the first cattle were killed that,

if he did not take his cattle away, the defendant would kill all of them.

S. B. Smith testified that he was at the station on the morning of the twenty-fifth, and saw the first two animals that were killed; that he found cattle tracks around the warehouse; and that the salt barrels were wet where the cattle had been licking them. This witness also testified that, about two weeks or perhaps a month before the cattle were killed, he bought a barrel of salt from the agent, and that he then saw an open barrel of salt under the warehouse.

William Collins testified that, some time before the cattle were killed, he bought some salt from the agent, and that he got it out of an open barrel under the warehouse; this witness was at the station on the morning of the twenty-sixth of May, after the second lot was killed, and saw fresh cattle tracks around the warehouse.

The plaintiff introduced the agent to prove the kill-ing of the stock, and that he had placed the salt under the warehouse. On cross-examination he testified that the warehouse belonged to the Imperial Milling Company, and that the railroad had nothing to do with it. In answer to a question, whether he had looked for cattle tracks around the warehouse the morning after the first two animals were killed, he answered: "Yes, sir; I did not see anything. I went there the next morning after the killing. I got up in the night, when I heard the train whistle, when it was opposite my house, about where the cattle were killed. The cattle had been there during the daytime; I had run them off. * * * *I knew there would be trouble about it, and the salt would be the first thing, and I looked where the salt was, and I did not see any tracks. * * * But the morning after the second lot were killed there were tracks there." The witness then stated that, during the day of May 23,

there had been fifty or sixty head of cattle around the station, and that he had tried to keep them away; that he had chased them off with a dog; that there was one barrel of the salt open; that it was near the outer edge of the warehouse; and that the full barrels were lying on the ground probably ten feet from the outer edge. There was also evidence tending to show that there was very fair grass on the east side of the track within the station limits. The foregoing is believed to be a full statement of the evidence bearing on the cause of the accident.

To authorize a recovery, it was incumbent on the plaintiff to show by substantial evidence that the alleged act of negligence was the cause of the injury. Circumstantial evidence was sufficient to prove the issue, but such evidence must have been of a character to remove the question from the domain of mere conjecture. Therefore, if, under the evidence, the fair legal inference is not admissible that the cattle were attracted to the station by the salt, and were by reason thereof injured and killed by trains passing along the defendant's road, then the demurrer to the evidence ought to have been sustained for that reason; or, if the evidence is such as to relieve the defendant from legal liability on account of the negligent act of the agent in storing the salt on the right of way, then for *this* reason also the court was wrong in its ruling.

We think that it is a fair inference that two of the last lot of cattle were attracted to the station by the salt, and by reason thereof were killed. Several witnesses testified that cattle had been licking the salt barrels during the nights of the twenty-fourth and twenty-fifth of May. One of the animals was struck near the warehouse, and the other was found dead beside the track about two or three hundred feet south of the warehouse. The third animal was found in an

adjacent field, and the evidence fails to show at what point it came upon the track or where it was struck. We, therefore, can see no connection between the killing of that animal and the alleged act of negligence.

The evidence as to the first two animals that were killed is not, in some respects, so satisfactory. When struck, they were nearer to the warehouse than the others, but there is no positive proof that cattle had been around the salt barrels during the night or previous thereto. The plaintiff says that he saw cattle tracks around the salt barrels, but he does not say when he saw them—whether before or after the first accident. On the contrary the agent swears that he examined the ground the next morning, but found no cattle tracks in the immediate vicinity of the salt. But we do not consider that the proof of this physical fact was absolutely essential. It is a matter of common knowledge that, when salt is left exposed, it will attract cattle and horses for considerable distances. That fact is entitled to considerable weight in determining this issue. In addition to this we have the testimony of the agent that, on the day preceding the night in which these cattle were killed, the cattle from the neighborhood congregated at the station in large numbers, and that he was compelled to chase them away by putting a dog after them; that, when he ascertained that the cattle had been killed, he went to see if he could find whether or not they had been around the salt barrels. He said: "I knew there would be trouble about it, and the salt would be the first thing;" thus showing that the witness, who was in the best position to know the facts, was of the opinion that the cattle on the previous day had been attracted to the station by the salt. We, therefore, conclude that, as to the first two animals, there was evidence sufficient to authorize the jury to draw the inference that the cattle were attracted to the

station by the salt, and that they were exposed to danger and killed on account of it. The fact that there was some grass along the east side of the track does not destroy the force of this evidence. It is not probable that cattle would be induced to come to such a place to graze, especially in large numbers, when the grass could not under the circumstances have been very good or wholesome. However, if it were reasonbly doubtful under the evidence whether the grass or the salt attracted the cattle, the defendant would be released altogether, because it was under no obligation to make the grounds around its stations safe pastures for cattle.

It is urged that the agent in storing the salt on the defendant's right of way was engaged in his individual business, and, therefore, the defendant cannot be held. The defendant's liability in this case does not rest on the ground that its station agent, in conducting the defendant's business, created the nuisance, but the agent as to that particular act is to be regarded as a stranger, and then the defendant is held upon the theory that its legal duty is to so police its right of way as to prevent and remove all attractive dangers placed on its tracks or right of way, by its servants or others. Here the nuisance had been of such long standing that it must be presumed that the defendant had knowledge of it.

Neither do we think that the defendant is released from liability on the authority of *Gilliland v. Railroad*, 19 Mo. App. 411, even though it be conceded that the opinion in that case is founded on sound legal principles. The only proof in reference to the warehouse was that it belonged to the Imperial Milling Company. There is nothing to show by what authority it was erected or for what particular purpose or purposes. The only purpose for which it was used, as shown by the evidence, was the storage of salt under it in such a

way as to prove a dangerous nuisance; which the defendant was in duty bound to abate as soon as it had notice of its existence. This point is not presented in the briefs, but it has suggested itself to the court in the consideration of the case.

Our conclusion is that the demurrer to the evidence was properly overruled, except as to the steer found in Morris' field which the evidence showed was worth $30.

It was averred in the statement, and established by the evidence, that Hurricane station, where the stock was killed, was in Burr Oak township, in Lincoln county. The transcript showed that J. A. Whiteside, before whom the suit was brought, was a justice of the peace for said township. This established *prima facie* the official character of the justice. *Emmerson v. Railroad*, 35 Mo. App. 621; *Rohland v. Railroad*, 89 Mo. 180; *Powers v. Braley*, 41 Mo. App. 556.

In this state the owner of cattle may allow them to run at large (*Gorman v. Railroad*, 26 Mo. 441; *Tarwater v. Railroad*, 42 Mo. 193; *McPheeters v. Railroad*, 45 Mo. 22), and the plaintiff was at liberty to avail himself of this privilege as to his cattle, although he knew that the salt at the station was stored in a place where cattle could get to it. *Brown v. Railroad, supra; Wilson v. Railroad*, 87 Mo. 431. Hence, defendant's instructions numbers 8 and 9 were properly refused.

The plaintiff admitted on his cross-examination that, if he had taken the hides from the cattle killed, he could have realized $7 or $8 from their sale. The court instructed the jury that it was the duty of the plaintiff, unless prevented from so doing by the servants of the defendant, to save any part or parts of the animals killed, and that the value of such parts which could have been saved should be deducted from the value of the cattle. It is evident, from the amount of

the verdict, that no such credit was given, and to the extent of $7 or $8 it is claimed that the verdict is excessive. We are not prepared to say that a farmer, whose animal has negligently been killed by the cars or by any other agency, is bound to stop his work for the purpose of looking after the carcass. Indeed, we are of the opinion that the law imposes no such duty. If the animal is crippled, he ought to make an effort to save its life, if it is reasonable to suppose that the effort will result in any good. We do not think he ought to be compelled to skin a dead animal, or otherwise make use of the carcass.

If the plaintiff will remit the sum of $30, the value of the animal killed in Morris' field, the judgment for the residue will be affirmed. If the *remittitur* is not made during the term, the judgment will be reversed and the cause remanded. Judge THOMPSON concurs. Judge ROMBAUER dissents, and is of opinion that the decision herein rendered is contrary to the previous decision of the Kansas City Court of Appeals in *Gilliland v. Railroad*, 19 Mo. App. 411, and is opposed to the analogies of other cases on this subject in this state. The case will, therefore, be certified to the supreme court for final determination under section 6 of the constitutional amendment touching the judicial department. So ordered.

ROMBAUER, P. J. *(dissenting)*.—The decision in this case is contrary to the decision of the Kansas City Court of Appeals in *Gilliland v. Railroad*, 19 Mo. App. 411, on both points involved, and, hence, under the constitutional mandate it becomes our duty to certify the case to the supreme court for final adjudication. The plaintiff's witness, Baumeister, testified that the salt was his property; that the warehouse wherein it was stored was the warehouse of the Imperial Milling Com-

pany; and that the defendant had no control either over the salt or the warehouse. Nor is there any evidence to the contrary in the record; hence, the case is the same as the *Gilliland case* in all its features, except that upon its facts it is one much stronger in favor of the defendant.

While I concede that a railroad company is under an obligation to police its track, so as not to make it extra hazardous to cattle at large (*Crafton v. Railroad,* 55 Mo. 580; *Schooling v. Railroad,* 75 Mo. 518), I cannot concede the further claim that it is under a similar duty as to its right of way outside of its tracks. If such were the law, a railroad company would rest under an obligation to destroy the grass on its depot ground, and on other places adjoining its tracks, wherever its right of way is not fenced, and where it is under no legal obligation to fence it. Grass will attract cattle as well as salt or hay, although the degree of attraction may be different. By the same rule the railroad company would be under obligation to keep out of its warehouses all salt, and restrict by covenants any of its lessees from using sheds on its right of way for the storage of corn or grain or any other material likely to attract cattle. The very fact that cattle have been killed in many instances, attracted to unfenced depot grounds by one or the other of these causes, and that no case can be found which holds the company liable on the theory of a police duty extending over *the entire right of way,* tends to show that no such legal duty exists.

I am further of opinion that no such connection between the storage of the salt and the killing of the cattle was shown, as would warrant the logical inference that the former was the proximate cause of the latter. To warrant such an inference, it would at least be

necessary to show that the cattle were killed in the immediate vicinity of the salt. As to the cattle killed on the twenty-third, the plaintiff's own evidence shows that no cattle had been to the salt prior to the killing; and, as to the cattle killed on the twenty-fifth, two of them, under all the evidence, were killed at a considerable distance from the salt. None were killed in the immediate vicinity. For aught that appears the cattle may have been in the habit of straying on these grounds without regard to the presence of the salt. All the evidence tends to show such was the fact. If the jury were warranted in inferring that the direct and proximate cause of the killing of four of the cattle was the salt, then they were warranted in inferring that it was the direct cause of killing all of them; because, if we once depart from the limit of the immediate vicinity, we cannot logically fix any other limit, unless we retry the facts. Even then the proper elements for a retrial here are wanting.